HERBERT LIGHTHIPE, PROSECUTOR, v. THE CITY OF
ORANGE, THE CROCKER-WHEELER COMPANY AND
THE WESTERN ELECTRIC COMPANY, RESPONDENTS.

Argued February 20, 1907—Decided June 10, 1907.

1. Where the review by the Supreme Court of ordinances and other
   municipal proceedings requires the investigation of questions of
   fact, the power of the court to inquire into such matters of fact
   exists as a part of the constitutional jurisdiction of the court,
   and is not dependent for its existence upon the *Certiorari* act.
   *Pamph. L.* 1903, *p.* 346, § 11; *Pamph. L.* 1906, *p.* 658.
2. Under the act of April 10th 1906, entitled "An act to authorize
   cities of this state having a plant, appliances or machinery de-
   signed or used for furnishing a public water-supply to utilize, use
   and develop any power which may be derived therefrom, and to
   develop additional power to furnish electrical energy for lighting
   or other public use, and to provide funds necessary for this pur-
   pose" (*Pamph. L.* 1906, *p.* 157), a city, in order to establish an
   electrical plant by virtue thereof, must, at the time it assumes to
   exercise the authority, be possessed of some plant, appliances or
   machinery already established in connection with its public water-
   supply, and from which, by some practicable method, it may
   derive mechanical power, which, either alone or together with
   additional power to be developed for the purpose, may be used in
   furnishing electrical energy.
3. The design of the act referred to (*Pamph. L.* 1906, *p.* 157) is not
   complied with unless mechanical power, to be derived from the
   plant already in existence, is in fact to be used, either alone or in
   combination with the additional power, in furnishing electrical
   energy.

On *certiorari.*

Before Justices FORT, HENDRICKSON and PITNEY.

For the prosecutor, *Chauncey G. Parker.*

For the respondents, *William A. Lord.*

The opinion of the court was delivered by

PITNEY, J.   This writ brings under review certain resolu-
tions adopted by the common council of the city of Orange,

November 12th, 1906, awarding contracts to the Crocker-Wheeler Company and to the Western Electric Company, for the construction and installation of the necessary steam engines, electric generators, switchboards, arc lights, poles, wires and equipment for a system of public electric street lighting.

The prosecutor is a resident of the city and a large property owner and taxpayer. He has therefore a legitimate interest in the proceedings under review. We do not think he is barred by laches. His application for the writ was made on December 6th, and up to that time no money had been expended either by the city or by the companies, or either of them, towards the execution of the contracts, the only previous disbursements being such as were necessary to enable the companies to make estimates and submit their bids, and these were incurred before the contracts were awarded.

It is admitted that the city has no legal authority to enter into these contracts other than such as may be derived from an act of the legislature approved April 10th, 1906. *Pamph. L., p.* 157. The revised charter of the city (*Pamph. L.* 1869, *p.* 182, § 15, *subsec.* 18), empowers the common council by ordinance to provide and maintain lamps and gas fixtures and to light the streets and public grounds;. but it is conceded that this did not by implication confer authority to erect and maintain an electric plant, for reasons pointed out by this court in *Howell* v. *Millville,* 31 *Vroom* 95.

The act of 1906 just referred to has the following title: "An act to authorize cities of this state having a plant, appliances or machinery designed or used for furnishing a public water-supply, to utilize, use and develop any power which may be derived therefrom and to develop additional power to furnish electrical energy for lighting or other public use, and to provide the funds necessary for this purpose." Its first section empowers "The board or body having charge of the public lighting and public water-supply in any city of this state to utilize and use any property which is now or has formerly or may hereafter be used by such city for the purpose of supplying water for .public use, for the purpose, also, of generating

electrical energy to supply such city with light or for other public use, and for this purpose such board shall have power and authority to purchase, or condemn, lands or interests in lands or necessary water rights and purchase material and construct, reconstruct, erect, maintain and use such property and works and such other and additional works, plant, property and machinery as may be required to develop the required light or power." The remaining sections contain provisions for raising the money to defray the cost of construction and the expense of maintenance and operation.

Under the provision of our constitution which requires the object of an act to be expressed in its title, it is properly conceded that the authority conferred by the first section of this act cannot be extended beyond the limitation imposed by the title. *Hendrickson* v. *Fries,* 16 *Vroom* 555, 563; *Cooper* v. *Springer,* 36 *Id.* 594.

The reasons assigned by the prosecutor for setting aside the resolutions in question, and the contracts that have been made thereunder, rest in part upon the insistment that the act of 1906 is unconstitutional because it is a special law for regulating the internal affairs of cities, and because its object is not set forth in its title; and in part upon the insistment that in fact the city had not, at the time of the passage of the resolutions or at the time of the making of the contracts, any plant, appliances or machinery designed or used for furnishing a public water-supply from which any power could be derived for the development of electrical energy to operate the proposed municipal lighting plant; and that the lighting plant is not intended to be operated in whole or in part by any power derived from the plant, appliances or machinery used or designed for furnishing a public water-supply for the city. For the determination of these questions of fact we are referred to certain depositions that were taken for use upon the application for the allowance of the writ of *certiorari,* and which by consent of counsel are to be used with the same effect as if taken by leave of the court after the allowance of the writ.

It is, however, suggested rather than argued by the learned counsel for the respondents that this court, in reviewing the

proceedings of a municipal corporation, has no authority to inquire into matters of fact for the purpose of contradicting recitals that appear upon the minutes or other records of those proceedings, aside from the power that is conferred by section 11 of the *Certiorari* act. *Pamph. L.* 1903, *p.* 346; *Pamph. L.* 1906, *p.* 658. With this suggestion we do not agree. The section referred to provides for the determination of questions of fact in the review of taxes, assessments or other order or proceeding touching any local or public improvement, or to review the proceedings of any special statutory tribunal. The ordinary review of municipal ordinances and other proceedings, which this court has long exercised as a part of its constitutional jurisdiction, can in many instances not be pursued without making inquiry into questions of fact. Such inquiry is essential to the exercise of the constitutional jurisdiction of the court, and is not, we think, dependent for its existence upon the *Certiorari* act alone.

There was much controversy upon the argument with respect to the scope and purpose of the act of April 10th, 1906. Construing it, as we must, in subordination to the limitation imposed by its title, the next important principle to be kept in mind is that the act must be so construed, if possible, as to render it constitutional, not so as to render it a special law for the regulation of the internal affairs of cities. The title shows that it was not the design of the legislature to authorize all cities to exercise the powers conferred. Resort is had to classification, and to this end qualifications are imposed in order to differentiate the cities to which the act applies from those to which it does not apply. It is to be presumed that these qualifications were intended to be such as would form a substantial and constitutional basis for setting the designated class of cities apart for separate treatment, and thus relieve the act from being properly deemed special legislation. The ground of distinction, as pointed out in the title, is the possession, by those cities to which it is intended to apply, of some "plant, appliances or machinery" designed or used for a certain public purpose, and from which mechanical power may be derived for another public purpose, *i. e.,* for furnishing electrical

energy for lighting or other public use. The existing plant, appliances or machinery are to be such as are designed or used for furnishing a public water-supply. Manifestly, it was not the legislative intent that a city should be authorized to abandon the water-supply or to impair the efficiency of the plant for that purpose, in order to use the plant for developing electrical energy. The purpose therefore is that the municipal corporation, while still employing the plant for the purpose for which it was designed or is used, shall utilize the surplus of power therefrom (supplemented, if need be, by the additional mechanical power referred to in the title of the act), in order to furnish electrical energy for lighting, &c.

The only rational ground, so far as we perceive, upon which the classification indicated by the title of the act can be upheld as based upon substantial differences germane to the purpose of the legislation, is that, by establishing an electrical plant, in combination with a power plant already established for water-supply purposes, economy in the operation of the combined plants will probably result, thus enabling the city to obtain electric lights, &c., at less than they would cost if independently established and operated. Whether there is any reason for conferring this new capacity upon cities that can derive a surplus of power from a previously established water plant, and denying the same capacity to cities that may have a surplus of power from a plant established for some purpose other than that of a water-supply, is a question of some nicety, into which we have not deemed it necessary in the present case to inquire.

Our view is that, in order to give a rational and constitutional force to its language, the title of the act must be so construed as to render it necessary at least that a city, in order to establish an electrical plant thereunder, must be possessed of some plant, appliances or machinery already established in connection with its public water-supply, and from which by some practical method a surplus of mechanical power, substantial in amount, may be derived, which power, either alone or together with additional power to be developed for the purpose, may be practically used in furnishing electrical

energy. Construing the act as applying to cities that have no surplus, or only a theoretical and not a substantial surplus of power in the existing plant, would at once render the classification illusory, and the law therefore special.

And it is equally clear, we think, that the design of the act is not complied with unless mechanical power, to be derived from the plant already in existence, is in fact to be used, either alone or in combination with additional power, in furnishing the electrical energy. That is to say, if a city has the equipment necessary to qualify it for admittance into the designated class of cities, and yet, without attempting to use any part of this, and only availing itself of its possession in order to claim admittance to the class, undertakes to establish a plant for developing electrical energy without availing itself of the combination of plants that the act proposes as a measure of economy, its proceedings in that behalf must be held unreasonable, as being only a colorable compliance with the act, and not within its authority.

Entertaining the above views respecting the scope and purpose of the act of April 10th, 1906, we must reject certain suggestions that were made upon the argument, and that seem to us more ingenious than sound.

Thus, we reject the notion that the act is intended to apply to cities where it may be *theoretically possible,* although wholly impracticable, to develop from the water-supply plant, appliances or machinery some degree of power for furnishing electrical energy. So the existence of water in the pipes, from which water, by the application of heat, power might be developed, does not of itself import the possession of such a "plant, appliances or machinery" as are contemplated by the act. Nor is it conceivable that the legislature intended or contemplated such power as would be derived by applying force pumps to the distributing mains, and thereby increasing the water pressure to such an extent that upon being released it would drive a turbine wheel and thereby operate an electric lighting plant. This would result, necessarily, in a waste of energy, and is altogether impracticable.

We think the language of the act is intended to be understood in its ordinary and popular significance; that it is intended to authorize cities that have "a plant, appliances or machinery designed or used for furnishing a public water-supply," to use and develop any power which may be derived *therefrom* (that is, derived from the plant, appliances or machinery already referred to), and to develop additional power for electric lighting purposes, &c. The power derived from the water-supply plant, &c., which is to be used for electric lighting purposes or other public use, is intended to be a practical, not a theoretical, surplus of power. The "additional" power is intended to be supplemental to such surplus.

We think, also, that the act applies only to such cities as possess the requisite plant, appliances or machinery *at the time they assume to exercise the additional authority conferred by this act.* Only on this view does it set forth a substantial ground of classification. And so, where the title of the act says "designed or used for furnishing a public water-supply," the word "designed" is not intended to mean "planned but not yet installed."

Nor can we accede to the suggestion that the clause, "use and develop any power which may be derived therefrom *and* to develop additional power," is to be read as if the word "or" were substituted for the word "and" where italicised. This use of the disjunctive would render the new mechanical power independent of that already existing, and not "additional" (that is, supplemental), and at the same time would deprive the classification of all reason for existence.

The questions, then, are whether the city of Orange is within the class established by the act of April 10th, 1906, and whether the plan proposed by the resolutions and contract under review are fairly within the authority attempted to be conferred by that act.

The city has a large storage reservoir of about two hundred million gallons capacity, situate on the west branch of the Rahway river, about two miles west of the city. From this reservoir a sixteen-inch main extends southwesterly to and into the township of Millburn, and thence northeasterly up

the east branch of the Rahway to the city of Orange. For some years this main supplied the city wholly by gravity. As the amount of water consumption increased, the friction in the pipe became greater, and thus cut down the pressure in the city; this, together with the growth of the city upon the higher ground, made it impracticable to give a proper service by gravity alone, and therefore the supply was increased by the establishment of a smaller storage upon the west branch of the Rahway at Campbell's pond, in the township of Millburn, and at this point a pumping station was established having a capacity of about two million five hundred thousand gallons per day, and water was and is thereby pumped from the Campbell's pond reservoir into the sixteen-inch main, by which means the pressure and working head of water in the mains at the city of Orange is increased. The large storage reservoir, the Campbell's pond reservoir, the pumping plant and the sixteen-inch main are now in use. This plant is, in strictness, the only plant, appliances or machinery designed or used for furnishing a water-supply to Orange.

There is, however on Chestnut street, in the city, a power station known as the Chestnut street sewage pumping station, which was constructed originally for the purpose of pumping sewage. There are at this station two compound Worthington pumps, developing about nine horsepower each, one of which normally does the sewage pumping, and the other is held in reserve against accidental stoppages, and there are two steam boilers of forty to fifty horsepower capacity each, one of which is kept in use and the other held in reserve.

After the establishment of this sewage pumping plant, and about the year 1893 or 1894, there was installed in the Chestnut street station a small duplex Worthington water pump, having a capacity of about seven hundred and fifty thousand gallons, and this takes its steam from the boilers of the sewage pumping station and is used for the purpose of increasing the water pressure in the mains in the higher parts of the city. The horsepower rating of the boilers bears no direct relation to the horsepower developed by the pumps, and the sewage and water pumps as used employ about ninety per cent. of the

steam capacity of one of the boilers, the other boiler, as already mentioned, being held in reserve against accidental stoppages.

It seems to us clear that this small water pump at the Chestnut street station is a mere appendage to the sewage pumping plant, and that the Chestnut street plant is not a plant "designed or used for furnishing a public water-supply" within the meaning of the act of 1906. What is done at this station is to use the surplus steam-supply of a sewage pumping plant for the purpose of increasing the pressure in some of the water mains in the city of Orange. There is no surplus of power at this plant. The boilers are already burdened up to the fair limit of their capacity, allowing a reasonable margin for safety. The holding of one boiler in reserve is a necessary precaution against breakdowns.

Our finding, as a matter of fact, is that the city of Orange has at present no plant, appliances or machinery designed or used for furnishing a public water-supply, from which any surplus of power may be derived for furnishing electrical energy.

Moreover, it is not proposed to use any power from the present plant in the operation of the proposed lighting system. The plan that the city proposes to adopt is as follows: Pending the consideration of a proposition to install the municipal electric lighting plant, and on October 29th, 1906, pursuant to a communication from the mayor to the common council, dated October 24th, which called attention to a threatened water famine, the city made a contract with the Snow Steam Pump Works by which that company agreed to furnish and erect at the Chestnut street pumping station two horizontal compound condensing pumping engines, each of a capacity of three million gallons per day against a head of three hundred and four feet. The purpose of this contract is to enable the city to do on a larger scale what is already being done at the Chestnut street pumping station towards increasing the pressure in the water mains of the city, and perhaps also to render unnecessary the maintenance of the pumping plant at Campbell's pond. There is also on foot, and partly executed, a plan

to lay a twenty-inch main from the storage reservoir to the city, which is to be used either in addition to or as a substitute for the sixteen-inch main. The projects for the future development of the water plant also include the suggestion of a new storage reservoir, but this is not yet decided upon, nor has even the location of the new storage been determined.

The contracts with the Crocker-Wheeler Company and the Western Electric Company that are now under review contemplate the installation of the necessary engines, generators, &c., for and including three hundred and fifty standard arc lights (each of two thousand candle power) for street lighting, at a cost of $60,000 to $70,000. The engines are to be Ball & Wood compound engines, which are especially designed for electric lighting purposes, and have nothing whatever to do with any water pumping plant present or proposed.

The design is that when the Snow pumps are installed one of them shall be kept in use and the other held in reserve against accidental breakdowns. Each one of these pumps, if operated to its full capacity, would require one hundred and sixty-eight horsepower; if operated according to the present needs of the city, it will require about one hundred and forty horsepower. Either one of the pumps is entirely beyond the capacity of the present steam boilers at the Chestnut street station.

The plan of the city is to establish a new boiler plant of six hundred and seventy-five horsepower capacity, using four hundred and fifty horsepower and holding two hundred and twenty-five in reserve, and with the four hundred and fifty boiler horsepower it is proposed to operate the sewage pumps, the Snow pumps and the electric lighting engines.

These boilers, however, have not as yet been installed or contracted for, they not being included in either of the three contracts referred to. The plan does not contemplate the use as a part of the completed plant of either of the two small boilers that are now at the Chestnut street station. One or both of them will be kept temporarily in use as at present until the new boiler plant is installed.

As a matter of fact, the plan is to abandon the present pumping plant at Campbell's pond (or at least not to use it at all in connection with the electric lighting plant), to abandon the present boilers and Worthington water pump at the Chestnut street station, and to establish a new boiler plant of four hundred and fifty horsepower capacity, and therefrom to derive steam for the operation of the present sewage pumps, together with the new Snow water pumps that are contracted for but not yet installed, and the new electric lighting plant that is the subject of this controversy. The proposed electric lighting plant is not to be appendant or appurtenant to anything in the present water system, nor is it to be operated in whole or in part by any power derived from any of the "plant, appliances or machinery designed or used for furnishing a public water-supply," now owned by the city.

In our opinion, therefore, the city of Orange is not within the class of cities pointed out in the act of 1906, and the proposed municipal lighting plant is not authorized by the terms of that act.

In the evidence and upon the argument much stress is laid upon the apparent saving of public moneys that would result from the establishment of the new municipal plant that is proposed. With regard to this we can only say that, however desirable it may seem to permit a municipality to establish a plant of this character, it can lawfully be done only by authority of the legislature. We should depart from our duty were we to give to the act of the legislature that is cited in support of the project a meaning different from that which appears to us to result from its plain terms.

The resolutions and contracts under review should be set aside. The question of costs is reserved.